AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Colorado

**In the Matter of the Search of:**

Content, to Include Text Messages, Associated With The Cellular Telephone Assigned Call Number 719-406-0980 That Is Stored At Premises Controlled By T-Mobile US, Inc.

)
)
)
)
)

Case No. 21-sw-00727-STV

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the __State and__ District of __Colorado__:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is:

    X  evidence of a crime;

    X  contraband, fruits of crime, or other items illegally possessed;

    X  property designed for use, intended for use, or used in committing a crime;

    ☐  a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Distribution/Possessing with Intent to Distribute |
| 21 U.S.C. § 846 | Conspiracy to Distribute |
| 21 U.S.C. § 843(b) | Use of a communication Facility to Facilitate Drug Felony |

The application is based on these facts:

    X  Continued on the attached affidavit, which is incorporated by reference.

    ☐  Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*s/ Marcus Juliano*
*Applicant's signature*

Marcus Juliano – FBI TFO
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
                      ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: ___July 8, 2021___

_____
*Judge's signature*

City and state: __Denver, CO__

Hon. Scott T. Varholak, U.S. Magistrate Judge
*Printed name and title*

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to content, to include text messages, associated with 719-406-0980 that is stored at premise owned, maintained, controlled, or operated by T-Mobile, a wireless provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

## ATTACHMENT B

### Particular Things to be Seized

### I.  Information to be disclosed by T-Mobile

To the extent that the information described in Attachment A is within the possession, custody, or control of T-Mobile, including any messages, records, files, logs, or information that have been deleted but are still available to T-Mobile or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), T-Mobile is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      All voice mail, text, and multimedia messages stored and presently contained in, or on behalf of the account or identifier;

b.      All existing printouts from original storage of all of the text messages described above;

c.      All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used from November 10, 2020, to present;

d.      All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message;

e.      All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names, addresses, shipping addresses, date account was opened, length of service, the types of service

utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

      f.      Detailed billing records, showing all billable calls including outgoing digits, from November 10, 2020 to present;

      g.      All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number), from November 10, 2020, to present;

      h.      Incoming and outgoing telephone numbers, from November 10, 2020, to present;

      i.      All records indicating the services available to subscribers of individual accounts and/or identifiers described above;

      j.      All records pertaining to communications between T-Mobile and any person regarding the account or identifier, including contacts with support services and records of actions taken.

## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. 841(a)(1) and (846) involving John Cruz since January 1, 2021, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) communications in any format about the distribution and or sale of narcotics, the transportation of narcotics, the use of firearms in connection with the distribution of narcotics;

(b) photographs of narcotics, or persons involved in the distribution of narcotics, and of firearms in the context of possession by John Cruz;

(c) Evidence indicating how and when the cellular device and associated cellular service was used to determine the chronological context of cellular device use, account access, and events relating to the crime under investigation;

(d) Evidence indicating the geographic location of the cellular device at times relevant to the investigation;

(e) Evidence indicating the cellular device owner or user's state of mind as it relates to the crime under investigation;

(f) The identity of the person(s) who created the account associated with the cellular device and/or used the cellular device, including records that help reveal the whereabouts of such person(s).

(g) The identity of the person(s) who sent to and/or received communications from the cellular device about matters relating to the distribution of narcotics, including records that help reveal their whereabouts.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Marcus Juliano, a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI), (hereinafter "your affiant") being duly sworn, states as follows.

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by T-Mobile, a wireless provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require T-Mobile to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.      I am a TFO with the Federal Bureau of Investigation (FBI), United States Department of Justice, and has been so employed since September of 2020.  I am presently a member of the FBI Denver Field Division and am assigned to the Southern Colorado Violent Gang Safe Streets Task Force.  Additionally, I am a Detective assigned to the Special Investigative Division (SID) of the Pueblo Police Department (PPD) and have been employed by the PPD since 2010.

3.      As a TFO, my duties and responsibilities include conducting criminal investigations of individuals and entities for possible violations of federal laws, particularly those laws found in Title 18 and Title 21 of the United States Code (U.S.C.).  I have previously participated in investigations which resulted in the arrests, searches, and seizures of individuals and property.  I have participated in the use of cooperating informants, undercover agents, pen register/trap and trace devices, video surveillance, wiretaps, GPS tracking devices, search

warrants, and audio surveillance, among other law enforcement techniques, in the course of my career with FBI and PPD.

4.      Additionally, I have participated in numerous controlled buys of firearms and narcotics from targets of law enforcement investigations. I have conducted large-scale gang-related investigations, as well as proactive and reactive investigations where individuals possess narcotics with the intent to distribute them.  I have investigated drug conspiracies and am familiar through experience and training how distributors operate and conduct their narcotics distribution networks.  Based on my training and experience, I am familiar with methods used by the criminal element in furtherance of a variety of criminal activities.

5.      I am also an experienced in the analysis of call detail records provided by cellular telephone carriers.  I have personally reviewed several sets of call detail records during the course of my career.  I have used the information from these analyses to understand a user's pattern of life based on call activity, have used information from these analyses to establish probable cause for different types of warrants, and have used information to identify new cell phone numbers for suspects.

6.      Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  The details set forth in this affidavit are from my personal knowledge of the investigation, review of reports and other documents, and/or from conversations with investigators having knowledge of the case.  I have set forth only the facts that I believe are necessary to establish probable cause that evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841 Distribution/Possessing with Intent to Distribute, 21 U.S.C. § 846 Conspiracy to Distribute and 21 U.S.C. § 843(b) Use of a Communication Facility to Facilitate a Drug Felony.

**BACKGROUND OF INVESTIGATION**

7.      In 2015, the FBI, in combination with the PPD, and Pueblo County Sheriff's Office ("PCSO"), began an investigation into the Ace Street Gang as a result of increasing violence and gang activity in the Pueblo, Colorado area.

8.      In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for T-Mobile subscribers may be located on the computers of T-Mobile.  Further, I am aware that computers located at T-Mobile contain information and other stored electronic communications belonging to unrelated third parties.

9.      Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail.  If the subscriber does not delete the message, the message may remain in the system of T-Mobile for weeks or months.

10.      Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers.  This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by T-Mobile for short periods incident to and following their

transmission.  In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

11.     Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems.  This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages.  Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

12.     Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.  A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

13.     Many wireless providers retain information about the location in which a particular communication was transmitted or received.  This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

14.     Wireless providers also maintain business records and subscriber information for particular accounts.  This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers.  In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed).  The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

15.     In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

16.     As explained below, information stored at the wireless provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider can indicate who has used or controlled the cellular device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time.  Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used.  Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation.  This "timeline" information may tend to either inculpate or exculpate the cellular device owner.  Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated into an image or video sent via text message to include both metadata and the physical location displayed in an image or video).  Last, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the wireless provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

17.     To date, multiple defendants involved in the Ace Gang have been criminal charged and prosecuted, both in the United States District Court for the District of Colorado and in the 10th Judicial District of Colorado (*Pueblo County, Colorado*).

18.     Through debriefings of cooperating defendants, suspect interviews, search warrants, physical surveillance, and other investigative techniques, investigators have identified a number of suspected sources of supply for the Ace Gang's narcotics distribution network.

19.     One of those suspected sources of supply is John Kenneth CRUZ, date of birth 06/25/1962, discussed further below.  CRUZ does not appear to be a known member of the Ace Street Gang.

20.     In addition to the interviews below, I found that CRUZ was mentioned as a source of supply in two other 2019 cases in the Pueblo Police Department (PPD) database.  (PPD Incident# 19-007473 and PPD Incident #19015065).

## TARGET CELL PHONE IS ASSOCIATED TO CRUZ

21.     T-Mobile cellular phone number 719-406-0980 (hereinafter the **"TARGET CELL PHONE")** is utilized by John Kenneth CRUZ, also known as Kenny Cruz, (date of birth 03/25/1962).

22.     On April 13, 2021, FBI Special Agent (SA) K.C. Hughes served an administrative subpoena on T-Mobile.  On April 23, 2021, T-Mobile returned the results of the subpoena and it showed that the phone had been active and was used as recent as April 13, 2021. Additionally, the return showed the JOHN CRUZ was listed as the subscriber for TARGET CELL PHONE.

23.     On June 9, 2021, I executed a Search Warrant for Pen Register Trap and Trace and GPS location data for TARGET CELL PHONE.  As of June 28, 2021, the TARGET CELL

PHONE was still active and location data combined with physical surveillance corroborates that CRUZ is likely utilizing the TARGET CELL PHONE.

## BACKGROUND INFORMATION OF JOHN KENNETH CRUZ

24.     I have reviewed a criminal history for CRUZ, and learned the following information related to his felony convictions.  CRUZ has also been arrested multiple times, and has other misdemeanor cases that are not included below.

        **a.**   In Pueblo County Court Case 2009CR347, CRUZ plead guilty to attempted escape, a Felony, and was sentenced to four years in the Colorado Department of Corrections.

        **b.**   In Pueblo County Court Case 05CR1081, CRUZ plead guilty to 2nd Degree Burglary of a dwelling, a class three felony, and was sentenced to eight years in the Colorado Department of Corrections.  The sentence was set concurrent with 2005CR55, in which CRUZ plead guilty Theft, a class four felony, and was sentenced to eight years in the Colorado Department of Corrections.

        **c.**   In Pueblo County Court Case 99CR98, CRUZ plead guilty to Escape, a class four felony, and was sentenced to two and half years in the Colorado Department of Corrections.  The sentence was set concurrent with 94CR1357, in which CRUZ plead guilty Criminal Attempt to Commit Possession of a Controlled substance, a class four felony, and was sentenced to three years in the Colorado Department of Corrections.

## WAGE INFORMATION FOR CRUZ

25.     I have requested information from the Colorado Department of Revenue related to CRUZ's earning.  I have reviewed that information, and found that CRUZ had no reported wages from 2015 to 2021.

26.     Although I suspect that CRUZ's income is primarily from the distribution of illegal narcotics, I know from prior investigations that sometimes individuals do not report wages to the State of Colorado for reasons such as self-employment, or as a 1099 wage earner. The fact that CRUZ does not have reported earnings is not intended to be the sole supporting fact in support of probable cause for the requested warrant.

## ARREST AND INTERVIEW OF JOSHUA WISTHOFF

27.     On November 23, 2020, detectives with the PPD SID arrested Joshua WISTHOFF, date of birth 4/22/86, a known Ace Street Gang member.  At the time of his arrest, WISTHOFF was in possession of illegal narcotics.  WISTHOFF was transported to PPD. During a formal interview, and after being advised of his Miranda rights, waiving those rights, and agreeing to speak with investigators without an attorney present, he provided the below information.  This interview was audio and video recorded.

28.     Prior to WISTHOFF's arrest, he was known by investigators to be actively involved in the distribution of illegal drugs, namely methamphetamine and heroin.  I submit that because of WISTHOFF's history as a drug dealer, he is familiar with different types of illegal drugs, the tradecraft of large volume drug dealers, the street prices of illegal drugs, the identification of illegal drugs, and the types of equipment used in furtherance of illegal drug sales. I submit that this make his statement related to the drug trafficking of other more reliable.

29.     WISTHOFF also had extensive history with the PPD. WISTHOFF has been arrested 27 times by the Pueblo Police Department and has 91 documented incidents/encounters in the Pueblo Police Department Computer System.  WISTHOFF has the following active "alerts" in the Pueblo Police Department Computer System: Drug dealer, known felon, parolee, provides false names, and a documented Ace Gang Member.

30.     Patrol officers/detectives will place "alerts" on individuals during investigations and encounters to have them flagged for specific reasons. These alerts are reviewed by the records section prior to being in the system, and primarily provide additional information for the purposes of Officer Safety.

31.     In addition to the information included below, Wisthoff provided information related to other gang activity that was independently corroborated by law enforcement.  For example, Wisthoff identified gang members already known to law enforcement.  Wisthoff was familiar with residential addresses, street names (monikers) of known gang members, vehicles associated with gang members, and social relationships between gang members.

32.     Since Wisthoff was familiar with these types of innocent facts and that information proved to be accurate, it is reasonable to believe that Wisthoff would also have accurate information related to illegal activities.

33.     Wisthoff appears to have provided reliable information and I am not aware of any false information Wisthoff has provided.  Additionally, I am not aware of any vendetta or grudge that Wisthoff holds against any person(s) named in this affidavit. Wisthoff provided information to law enforcement with the hopes of leniency of his pending criminal charges. Wisthoff was not provided any monetary compensation, and was not made any promises by the Government.

34.     WISTHOFF informed detectives one of his main sources of narcotics supply was CRUZ, and he would contact CRUZ via telephone on the TARGET CELL PHONE to discuss

the pricing, quantities, and meeting locations to obtain illegal drugs.  Wisthoff also stated that he owed CRUZ money.

35.     Since Wisthoff was on active parole that November, Pueblo Parole Officer Anita Archuleta requested WISTHOFF's phone be downloaded as per the conditions of his parole. Task Force Officer (TFO) Jeremy Mathews manually downloaded the phone and observed that there was contact with an individual with the contact name "Cruz" in the phone

36.      The phone number associated with Cruz was the TARGET CELL PHONE.  I reviewed the download and observed the following texts between CRUZ (TARGET CELL PHONE) and Wisthoff.  I have not included all the messages between Wisthoff and Cruz, however I have not purposely left out any messages that would be exculpatory in nature, or detract from probable cause for the requested warrant. Wisthoff and Cruz do have some conversations about things other than drugs, which supports their friendly relationship:

- 11/10/2020 at 2116 hours (sent): "Yo just let me know when outside my brotha….thank you"

- 11/10/2020 at 2117 hours (CRUZ replied): "Here"

37.     On November 13, 2020 at 1258 hours Wisthoff texted CRUZ, "Wts my bro" and "I need some b".  No response is observed from CRUZ, but in my training and experience "b" is short for "black" which is a street term used for heroin.

38.     On November 15, 2020 at 1949 hours Wisthoff texted CRUZ, "Bring some clear with u my brotha" and "Please and thanks I am here at the carwash".  Again, no response was observed from CRUZ, but in my training and experience the word "clear" is synonymous with methamphetamine.

39.     It should be noted that on June 18, 2021, I observed CRUZ at a car wash and in my training and experience I observed what was likely a hand-to-hand narcotics transaction

between CRUZ and two other individuals.  I never observed CRUZ washing his vehicle at any time during his time at the car wash and he appeared to be waiting both before and after the interaction I observed.

40.     On November 18, 2020, at 2214 hours Wisthoff texted CRUZ, " Hey wts up my brotha sorry brotha I been drinking with my brothers so if u won't come to me were I am at or I could meet with u in am for sure because I ant doing no runs tonight but I got your money with me brotha… if not I will call u in the morning as soon as I get up or just come to my house let me know".  At 2219 hours, CRUZ texted back, "Am is kool".  As stated above Wisthoff stated that he owed CRUZ money for drugs, and CRUZ appeared to be content with receiving the drug debt the following day.

41.     On March 18, 2021, WISTHOFF was indicted by a Federal Grand Jury in the District of Colorado on 8 counts.  Case no. 21-cr-00092-RM. Six of the eight counts were for knowingly and intentionally distribute and possess with intent to distribute a controlled substance.

**PROFFER OF WISTHOFF**

42.     On May 19, 2021, Wisthoff conducted a proffer.  His defense attorney was present for the interview, and Wisthoff agreed to provide nothing but truthful information. During his proffer, he made further statements about CRUZ to SA  K.C. Hughes and Task Force Officer Jeremy Mathews, FBI.  Wisthoff stated that he had been to CRUZ's residence on Pear Street in Pueblo, CO and had seen two large safes.  One of the safes had pounds of narcotics and the other was full of money and guns.

43.     Wisthoff was aware that that CRUZ got hundreds of pounds of heroin from a source outside of Pueblo.  Wisthoff also stated that if CRUZ thought he was being watched by the police he would move everything and go and stay in a hotel with just enough drugs for

himself.  CRUZ had told Wisthoff that he had several storage units with merchandise and likely more guns, but Wisthoff did not know the location of the units.

### ATTEMPTED TRAFFIC STOP ON MARCH 2, 2021

44.     On March 2, 2021, I observed a vehicle traveling with fictitious plates in the area of West Northern Avenue and Prairie Avenue, Pueblo, Colorado. I attempted to conduct a traffic stop, but the vehicle fled. Through my investigation discussed below I discovered the driver of that vehicle was Justin MILLER, date of birth 2/27/83.

45.     MILLER abandoned the motor vehicle several blocks away from the attempted traffic stop, and fled on foot. Detective's searched the area for MILLER and located a backpack containing a sizeable quantity of illegal narcotics. Investigators suspect that MILLER left this backpack on top of shed in a backyard of a residence.  MILLER was able to escape on foot.

46.     On March 10, 2021, PPD Detectives conducted an interview with Domika Williams, an associate of MILLER. After being advised of her Miranda rights, waiving those rights, and agreeing to speak with investigators without an attorney present, Williams provided the below information.  This interview was audio and video recorded.

47.     Williams explained that she and MILLER had recently attempted to locate the abandoned backpack, but had not been able to.  Williams stated that MILLER had become emotional and was crying when they could not locate the backpack. Among other evidence discussed below, Williams interview supports that the backpack recovered did indeed belong to MILLER.

### RECOVERY OF MILLER'S CELL PHONE AND ITS CONTENTS

48.     I applied for, and was granted a search warrant in the 10th Judicial District of Colorado for the vehicle MILLER was driving and located a cellular phone inside of it. An

additional search warrant was applied for and granted for this cell phone and its contents were downloaded and examined. The phone was identified as belonging to MILLER.

49.     Inside the cell phone I observed text messages between MILLER and the TARGET CELL PHONE.  In summary, the content of the messages was in relation to the distribution of illegal narcotics. TARGET CELL PHONE was saved as "Kenny Plug" in Miller's cell phone.  Kenny is CRUZ's middle name.  In my training and experience I am aware the term "Plug" is commonly used to describe a narcotics source of supply by drug dealers and drug users.

50.     Specifically, I observed the following text messages on the cell phone:

3/1/21 10:09 P.M. (sent)- Can I meet u

3/1/21 10:23 P.M. (received from Kenny Plug)- Soon I got blues.

3/1/21 at 2227 hours (sent)- "They still 10 or cheaper"

3/1/21 at 2235 hours (sent)- "LMK when to meet"

3/2/21 at 0014 hours (sent)- "We good to go yet"

3/2/21 at 0017 hours (received from Kenny Plug)- "lilllet u no asp"

3/2/21 at 0129 hours (sent)- "Stil"

3/2/21 at 0130 hours (sent)- "?"

3/2/21 at 0144 hours (received from Kenny Plug)- "Miss communication but there bringing it"

3/2/21 at 0239 hours (received from Kenny Plug)- "Going pic it up"

3/2/21 at 11:59 hours (received from Kenny Plug)- "160 + 850 + 850 + 50= 1910"

3/2/21 at 1453 hours (sent)- "U cant do better then that 850 that is"

3/2/21 at 1456 hours (sent)- "What I sell it for"

3/2/21 at 1554 hours (received from Kenny Plug)- "Well can do it 825"

3/2/21 at 1611 hours (sent)- "Alright An do u got a oz clear"

51.     Through my training and experience "blues" is a slang term referred to as Oxycodone Hydrochloride Pills on the street. These pills are normally blue in color and have the imprints of M and 30 on them. These same pills often also contain fentanyl and are disguised as Oxycodone Hydrochloride Pills. Through my training and experience "clear" is a slang term for methamphetamine. I submit the above messages are discussing the purchase of pills and methamphetamine from CRUZ.

52.     Your Affiant completed an arrest warrant for MILLER for several felony charges in relation to the traffic stop.

## THE ARREST AND INTERVIEW OF MILLER

53.     I was aware that MILLER had an extensive history with the PPD.  MILLER had been arrested 12 times by the Pueblo Police Department and had 32 documented incidents in the Pueblo Police Department Computer System. MILLER was also a two-time convicted felon.  I am aware that one of those felonies was for narcotics distribution.   MILLER had active "alerts" in the Pueblo Police Department Computer System for the following: drug user, drug dealer, known felon, weapon history, and escape risk/will run.

54.     I submit that because of MILLER's history as a drug dealer, he is familiar with many different types of illegal drugs, the tradecraft of large volume drug dealers, the street prices of illegal drugs, the identification of illegal drugs, and the types of equipment used in furtherance of illegal drug sales. I submit that this make his statement related to the drug trafficking of other more reliable.

55.     On March 10, 2021 I was able to locate MILLER at his residence located at 2029 Acero Avenue # 80, Pueblo, Colorado. MILLER was taken into custody on his active felony warrant.  At the time of his arrest, MILLER was in possession of illegal narcotics.

56.     MILLER was transported to the Pueblo Police Department to be interviewed. After being advised of his Miranda rights, waiving those rights, and agreeing to speak with investigators without an attorney present, MILLER provided the following information.  This interview was audio and video recorded.

57.     MILLER was questioned about the contact stored on his cellular telephone as "Kenny Plug", and the illegal narcotics located throughout my investigation. Miller identified "Kenny Plug" as John CRUZ (3/25/62) and stated he was the main "plug" that he gets his illegal narcotics from.  MILLER stated that he contacted him via the TARGET CELL PHONE. MILLER stated CRUZ deals in large amounts of illegal narcotics and is a main source of supply in the city of Pueblo.

58.     MILLER appeared to have provided reliable information and I am not aware of any false information MILLER had provided.  Additionally, I am not aware of any vendetta or grudge that MILLER holds against CRUZ. MILLER had provided information to law enforcement with the hopes of leniency of his pending criminal charges.  MILLER was not provided any monetary compensation, and was not made any promises by the Government.

## INTERVIEW OF MICHAELA MONTOYA

59.     On June 4, 2021, I interviewed Michaela Montoya at the PPD.  Montoya had been brought to the PPD because she was with an individual, unrelated to this case, who was arrested for bank robbery.   When PPD detectives questioned Montoya and determined she had no information and was not involved with the bank robbery, she was told she was free to leave.

60.     Montoya then requested to speak to Task Force Officer (TFO) Jeremy Mathews regarding her boyfriend, Joshua Wisthoff.  TFO Mathews was not available and when asked Montoya stated that she would talk to me and other detectives about her information.

61.     Montoya was never placed in hand cuffs and was aware that she was not under arrest, was free to leave, and any information provided was done voluntarily.  I have included some, but not all, of her statements below.  I am not aware of any vendetta or grudge that Montoya holds against CRUZ, but Montoya did state that she was afraid of CRUZ, and that CRUZ had asked to move into her house.  Montoya stated that she did not want CRUZ to move in and was attempting to move out.

62.     Montoya stated she met CRUZ approximately 9 months ago through Joshua Wisthoff, and believed that CRUZ sold illegal drugs. It should be noted that Wisthoff and Montoya know each other, and some of the information Montoya knew about Cruz could have reasonably come from Wisthoff.

63.     Montoya was aware that CRUZ currently lived on Pear Street. Through my training and experience and previous investigations I am aware that CRUZ lived at 631 Pear Street, Pueblo, Colorado.  Additionally, Montoya was aware of the vehicles that CRUZ drove and was able to describe some of them.  I was able to corroborate that CRUZ did indeed own vehicles that matched the descriptions of vehicles provided by Montoya.

64.     I asked Montoya how individuals got a hold of CRUZ to purchase narcotics and she stated they call him. Montoya stated he/she had CRUZ's cell phone number in her cell phone. I presented a Pueblo Police Department Cellular Consent Form and Montoya signed the form acknowledging her consent to download her phone. Her cell phone was downloaded.

65.     When I reviewed Montoya's phone, I observed the name "Cruz" saved in her phone with the TARGET CELL PHONE in the contact.

66.     Montoya stated the last time she contacted CRUZ on that number was on 06/04/2021, and that she had contacted CRUZ to buy heroin. Montoya stated that also on

06/04/2021, she met CRUZ at Loaf N Jug, located at 4800 Thatcher Avenue, Pueblo, Colorado, around 0030 hours to buy a ½ ounce of heroin. Montoya stated that she purchased the narcotics from CRUZ for $425.00 and CRUZ was driving a silver sedan during the sale.

67.     Montoya stated that CRUZ had mentioned using storage sheds to hold his valuables and narcotics several times, but never clarified where they were at.  Through conversations with John Cruz Jr., CRUZ's son, date of birth 09/11/1982, in the past, Montoya believed that the storage units were the units off of Thatcher Avenue, near the Loaf N' Jug, located at 4800 Thatcher Avenue, Pueblo, Colorado.  I am aware that Thatcher Avenue Mini Storage is located at 4625 Thatcher Avenue, Pueblo, Colorado.  I was later able to confirm that John Cruz did indeed rent both an outside storage spot and an interior container at Thatcher Avenue Mini Storage.

68.     Montoya was also aware of narcotics runners for CRUZ, Joseph Hernandez, date of birth 02/04/1965, and Jacob Lucero, date of birth 04/25/1985.  Montoya was only able to provide the number for Joseph Hernandez.  A review of CRUZ's call data records showed that CRUZ indeed had contact with the number provided for Hernandez.

69.     Since I was able to corroborate much of what Montoya provided me, I submit that it is reasonable that the information provided by Montoya was accurate and truthful.  Montoya appeared to have provided reliable information and I am not aware of any false information Montoya has provided.

### TARGET CELL PHONE IS STILL ACTIVE

70.     On April 13, 2021, FBI Special Agent (SA) K.C. Hughes served an administrative subpoena on T-Mobile.  On April 23, 2021, T-Mobile returned the results of the subpoena and it showed that the phone had been active and was used as recent at April 13, 2021. Additionally, the return showed the JOHN CRUZ was listed as the subscriber for TARGET CELL PHONE.

71.     On June 9, 2021, I executed a Search Warrant for Pen Register Trap and Trace and GPS location data for TARGET CELL PHONE.  As of June 28, 2021, the TARGET CELL PHONE was still active and location data combined with physical surveillance corroborates that CRUZ is likely using TARGET CELL PHONE.

72.     On June 18, 2021, I submitted a preservation letter to T-Mobile for text content regarding TARGET CELL PHONE.

73.     On or about May 12, 2021 T-Mobile advised law enforcement that they had identified a log file which was created for the purpose of evaluating the performance of their spam filtering tools. T-Mobile advised that the log file contained the plain text content of some SMS (also known as text) messages across the T-Mobile network for the period of January 3, 2021 to February 3, 2021. The data does not include any images or message delivery verification data. T-Mobile stated that they preserved the data contained within the log file and will respond to and provide the results of any search warrant or court order requesting text message content for available T-Mobile accounts received by July 15, 2021.

## AUTHORIZATION REQUEST

74.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

75.     Due to the sensitive nature of the investigation, it is requested that the warrant and accompanying affidavit and application in support thereof, as they reveal an ongoing investigation, be **RESTRICTED** until further order of the Court in order to avoid premature disclosure of the investigation, guard against flight, and better ensure the safety of agents and others, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents and other investigative

24

and law enforcement officers of the Federal Bureau of Investigation, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.

76.     I further request that the Court direct T-Mobile to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on T-Mobile, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

77.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

78.     I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

79.     I further request that this Court order that T-Mobile not to notify the subscriber of the existence of the warrant. The requested warrant relates to an ongoing investigation which involves the proactive use of cooperating individuals. I believe that notification would result in flight from prosecution, the destruction of evidence, harm to cooperating individuals, or otherwise seriously jeopardize this investigation. *See* 18 U.S.C. § 2705(b)(2), (3), (5).

80.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

## **CONCLUSION**

81.     Based on my training and experience, I submit there is probable cause that cellular telephone number 719-406-0980 (TARGET CELL PHONE), utilized by CRUZ, is used to communicate details about the distribution of a controlled substance, namely methamphetamines, heroin and fentanyl.

82.     I also submit that if the court grants the requested warrant, I believe the information requested in Attachment B will reasonably exist within T-Mobile's records. The information

requested in Attachment B will shed light on additional co-conspirators, potential suppliers of illegal drugs, and help identify other illegal narcotic distributors in the Pueblo, Colorado and surrounding areas.

83.     CRUZ has been utilizing the TARGET CELL PHONE in furtherance of a drug conspiracy for some time.  It should be noted that the above three interviews occurred on separate occasions, months apart, and that although Wisthoff and Montoya are familiar with each other, I am not aware that Miller knows Wisthoff or Montoya and vice versus.  Additionally, neither parties interviewed share the same phone number.  I have no information that their interviews are not credible or untruthful.  All three individuals know and state that CRUZ is drug dealer, and I was able to corroborate much of what they have provided.

84.     CRUZ has no reported wages from 2016 to 2021, but still is able to afford rent, pay for storage of a fifth wheel trailer and inside storage, has multiple vehicles and pays for a cellular phone.  It is likely that CRUZ is able to afford all of this because he is a drug dealer.

Respectfully submitted,

*s/Marcus Juliano*
Marcus Juliano – Task Force Officer
Federal Bureau of Investigation

Submitted, attested to, and acknowledged by reliable electronic means before me on this ___8th___ day of July, 2021.

SCOTT T. VARHOLAK
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

**Reviewed and Submitted by Dan McIntyre, Assistant United States Attorney.**

**To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the warrant will also function as a pen register order. I, Daniel McIntyre thus certify that the information likely to be obtained is relevant to an ongoing criminal investigation conducted by the above agency. See 18 U.S.C. §§ 3122(b), 3123(b).**